# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                        )
AMERICAN SUPERCONDUCTOR                 )
CORPORATION,                            )
                                        )
     Plaintiff/Counterclaim-Defendant,  )     Civil Action No.
                                        )     11-10033-FDS
          v.                            )
                                        )
S&C ELECTRIC COMPANY,                   )
                                        )
     Defendant/Counterclaim-Plaintiff.  )
_____)

## MEMORANDUM AND ORDER ON
## CLAIM CONSTRUCTION

**SAYLOR, J.**

This is a patent dispute involving inventions that provide reactive power compensation

for electric utility systems.  Plaintiff American Superconductor Corporation ("AMSC") seeks a

judgment that the PureWave DSTATCOM, as sold and configured by defendant S&C Electric

Company ("S&C"), infringes upon its patents.  S&C seeks declarations of non-infringement and

invalidity of AMSC's patents.

The parties' allegations hinge in part on the construction of the claims in AMSC's U.S.

Patent No. 6,900,619 (the "'619 patent"), U.S. Patent No. 7,265,521 (the "'521 patent"), and

U.S. Reissue Patent No. RE41,170 (the "'170 patent").  The Court conducted a *Markman* hearing

with respect to the construction of the relevant claims on October 16, 2012.

AMSC and S&C dispute five terms:  (1) "substantially simultaneously" and "in a period

substantially coincident with" (the parties agree that the two terms should have the same

meaning); (2) "activates the reactive power compensation device;" (3) "transient thermal

capacity characteristic;" (4) "in response to the need to connect;" and (5) "predetermined first duration."

## I.    Background

AMSC filed the application that ultimately produced the '619 patent on November 24, 1999.[1]  The '619 patent was issued on May 31, 2005, and the '521 patent was issued on September 4, 2007.  AMSC filed the reissue application for the '170 patent on January 19, 2007.  The '170 patent was reissued on March 30, 2010.

The '619 and '521 patents are directed to systems that minimize the step-voltage change as experienced by a consumer when a reactive power source is connected to the utility power grid.  In a normal electric-power grid, most of the power flow is what is known as "real power," which represents a transfer of energy from a generation source to a load, where it is used up by doing work, such as lighting a bulb or operating a television.  The other type of power flowing through the grid is called "reactive power."  Loads that draw reactive power absorb some of the energy flowing through the power line during a portion of each power cycle, and then release energy during another portion of the cycle.

Loads that draw reactive power are either "capacitive" or "inductive."  Capacitive loads and inductive loads release and absorb energy at opposite times during a power cycle, canceling each other out (that is, they exhibit the properties of having opposite polarity).[2]  For the power grid to run optimally, there should be a capacitive load to cancel out (that is, compensate for) any inductive load on the system, and vice versa.  The process by which utilities balance capacitive

---

[1] The application for the '521 patent was filed in 2005 as a continuation of the '619 application.

[2] By convention adopted in the patents-in-suit, capacitive reactive power is represented by a positive number, and inductive reactive power is represented by a negative number.

2

and inductive loads is known as "reactive power compensation."

Changes in the reactive power being drawn from a line has the potential to change line voltage, resulting in negative impact on electrical equipment connected to the grid (for example, lights flickering or computers crashing).  Because large capacitive or inductive loads may be suddenly connected or disconnected from the grid, utilities must be able to rapidly compensate for changes in the reactive power on the line to avoid these negative consequences felt by consumers.  Utilities accomplish this by adding or subtracting reactive power of the opposite polarity using "reactive power compensation devices."

Traditional reactive power compensation devices are simply banks of capacitors or inductors, which can be connected to the power line by throwing a mechanical switch. Unfortunately, the reliance on a mechanical switch caused a slight delay before the compensating power could reach the line.  Also, because the sizes of these capacitors or inductors are fixed, the amount of compensating reactive power might actually over- or under-compensate for the change in reactive power on the line.  With large capacitors and inductors, this difference can result in sudden, step-like changes in the amount of voltage on the line.  The voltage changes cause disturbances called "transients," which may cause problems for consumers.

Newer reactive power compensation devices use a computer-controlled inverter, which has the ability to simulate an inductor or capacitor bank of variable size over a given range. Because inverters are computer-driven, they can provide reactive power compensation virtually instantaneously.  The variability of output and instantaneous response make this type of inverters, known as "STATCOMs," superior to traditional inductor and capacitor banks.  However,

STATCOMs are significantly more expensive than equivalently sized inductor or capacitor banks.

AMSC's systems, as described in the '619 and '521 patents, seek to leverage the precision and responsiveness of STATCOMs with the size and economy of the traditional inductor and capacitor banks by connecting the technologies in one coordinated system.  In one embodiment of the invention, when the STATCOM reaches its maximum output of capacitive power, a capacitor bank is switched on and, "substantially simultaneously," a controller "activates the reactive power compensation device" (that is, the STATCOM) to provide power of the opposite polarity.[3]  By counteracting some of the capacitor bank's sudden large infusion of capacitive power, the invention negates all or part of the step-like change in reactive power and the accompanying change in voltage on the line.  After this initial softening of the surge in power, lasting for "a predetermined first duration," the STATCOM's inductive output is gradually reduced, which ramps up and fine tunes the amount of capacitive power on the line. Thus, the invention allows an electric utility to achieve STATCOM-like performance over a large range of output by leveraging a smaller, more affordable STATCOM (which alone would be incapable of meeting the systems reactive power requirements) with a large capacitor bank (which alone would lack the precision to respond without causing step-like voltage changes).

The '170 patent is directed to a system designed to maximize the output of a power compensation device when that device is operating in "overload" mode.  Reactive power compensation devices, such as STATCOMS, are rated by manufacturers to identify the maximum level of power at which they can operate indefinitely without incurring a significant

---

[3] Some of the patent claims describe the invention's process sequence occurring "in response to the need to connect the shunt reactive power source" (that is, the capacitor bank) to the power grid.

risk of overheating.  This rating is called the "maximum steady-state power delivery characteristic."  When a power compensation device is operating at a level of output that exceeds this rating, the device is said to be operating in "overload" mode.  The '170 patent teaches methods by which a power compensation device can purposely be operated in overload mode during short periods where high output is required.

When a device operates in overload mode, thermal energy accumulates in the device; that energy can damage or even destroy the device if it builds up for too long.  Therefore, a reactive power compensation device operating in overload mode must, at some point, reduce power output to normal levels to avoid damage.  In that situation, power must be decreased quickly enough to avoid overheating the device, but gradually enough to avoid causing sudden changes in voltage on the line.  The invention of the '170 patent is intended to negotiate that balance intelligently by calculating the magnitude and timing of the entire overload mode and ramp-down process.  That calculation is based on the "transient thermal capacity characteristic" of the reactive power compensation device.  The invention determines how to supply as much power as possible in overload mode without significantly increasing the risk of destruction of the device.

The invention of the '170 patent utilizes an inverter-based reactive power compensation device (for example, a STATCOM).  In order to determine how long, and at what power levels, the device may operate in overload mode, the '170 patent teaches how to calculate the total amount of heat that will accumulate over time and the device's ability to withstand that accumulated heat.  The embodiments of the patent include systems in which a device operates initially at a high level of overload output, and then continuously decreases power over a period of time calculated by the disclosed invention to get back to a steady-state level of output.

5

On January 6, 2011, AMSC filed suit under 35 U.S.C. §271 against S&C for infringement of the '619, '521, and '170 patents.  Specifically, AMSC contends that S&C has infringed on claims 1-21 of the '619 patent, claims 1-45 of the '521 patent, and claims 17-24, 28, 31-34, 41-53, 57, 60-63, 69-75 of the '170 patent.  On May 11, S&C filed counterclaims seeking declarations of non-infringement and invalidity of the '619, '521, and '170 patents.

## II.   Legal Framework

The construction of claim terms is a question of law.  *Markman v. Westview Instruments*, 517 U.S. 370, 372 (1996) ("[T]he construction of a patent, including terms of art within its claim, is exclusively within the province of the court.").

In *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*), the Federal Circuit clarified the proper approach to claim construction and set forth principles for determining the hierarchy and weight of the definitional sources that give the patent its meaning.  The guiding principle of construction is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of . . . the effective filing date of the patent application."  *Id.* at 1313.  Courts thus seek clarification of meaning in "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."  *Id.* at 1314 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

## A.  **The Words of the Claims Themselves**

The claim construction analysis normally begins with the claims themselves.[4]  The claims of a patent "define the invention to which the patentee is entitled the right to exclude."  *Id.* at 1312 (citing *Innova*, 381 F.3d at 1115).

In some instances, the arrangement of the disputed term in the claims is dispositive. "This court's cases provide numerous . . . examples in which the use of a term within the claim provides a firm basis for construing the term."  *Id.* at 1314.  For example, because claim terms are normally used consistently throughout the patent, the meaning of a term in one claim is likely the meaning of that same term in another.  *Id.*  In addition, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."  *Id.* at 1315.

## B.  **The Specification**

"The claims, of course, do not stand alone."  *Id.* at 1315.  Rather, "they are part of a fully integrated written instrument, consisting principally of a specification that concludes with the claims."  *Id.* (internal citations and quotations omitted).  For that reason, the specification must always be consulted to determine a claim's intended meaning.  "[T]he specification is always

---

[4] In *Phillips*, the Federal Circuit discredited the practice of starting the claim construction analysis with broad definitions found in dictionaries and other extrinsic sources:

> [I]f the district court starts with the broad dictionary definition . . . and fails to fully appreciate how the specification implicitly limits that definition, the error will systematically cause the construction of the claim to be unduly expansive.  The risk of systematic overbreadth is greatly reduced if the court instead focuses at the outset on how the patentee used the claim term in the claims, specification, and prosecution history, rather than starting with a broad definition and whittling it down.

*Id.* at 1321.  Of course, if no special meaning is apparent after reviewing the intrinsic evidence, claim construction might then "involve[] little more than the application of the widely accepted meaning of commonly understood words."  *Id.* at 1314.

highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* (citing  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

"In general, the scope and outer boundary of claims is set by the patentee's description of his invention." *On Demand Mach. Corp. v. Ingram Indus.*, 442 F.3d 1331, 1338 (Fed. Cir. 2006); *see also Phillips*, 415 F.3d at 1315-1317 ("[T]he interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim").  "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess." *Phillips*, 415 F.3d at 1316.  It may also reveal "an intentional disclaimer, or disavowal, of claim scope by the inventor."  *Id.*  Therefore, the claims are to be construed in a way that makes them consistent with, and no broader than, the invention disclosed in the specification.  *On Demand*, 442 F.3d at 1340 ("[C]laims cannot be of broader scope than the invention that is set forth in the specification."); *Phillips*, 415 F.3d at 1316 ("[C]laims must be construed so as to be consistent with the specification, of which they are a part.").

Nevertheless, courts must be careful to "us[e] the specification [only] to interpret the meaning of a claim" and not to "import[] limitations from the specification into the claim." *Phillips*, 415 F.3d at 1323; *see also Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1375 (Fed. Cir. 2005) (internal quotations omitted).  A patent's "claims, not specification embodiments, define the scope of patent protection."  *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009); *see also Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1381 (Fed. Cir. 2009) ("[E]mbodiments appearing in the written description will not

be used to limit claim language that has broader effect.").  "In particular, we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Phillips*, 415 F.3d at 1323.  This is "because persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments." *Id.*

Although this distinction "can be a difficult one to apply in practice[,] . . . . the line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms." *Id.*  Ultimately, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.* at 1316 (citing *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

### C.    The Prosecution History

After the specification and the claims themselves, the prosecution history is the next best indicator of term meaning.  The prosecution history consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent. *Id.* at 1317.  "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Id.*  "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* (citing *Vitronics*, 90 F.3d at 1582-83).

However, "because the prosecution history represents an ongoing negotiation between

the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* As a result, courts generally require that "a patent applicant [] clearly and unambiguously express surrender of subject matter" to disavow claim scope during prosecution. *Voda v. Cordis Corp.*, 536 F.3d 1311, 1321 (Fed. Cir. 2008) (quoting *Sorensen v. Int'l Trade Comm'n*, 427 F.3d 1375, 1378 (Fed. Cir. 2005)).

### D.   Extrinsic Sources

Extrinsic evidence consists of "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317. It "can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean." *Id.* at 1319. However, extrinsic evidence suffers from a number of defects, including its independence from the patent, potential bias, and varying relevance. *Id.* at 1318-19. Such evidence is therefore "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence," and courts may consider, or reject, such evidence at their discretion. *Id.* at 1319.

## III.   Analysis

### A.   Claim Terms of the '619 and '521 Patents

The proposed constructions of the disputed terms in the '619 and '521 patents are as follows:

| CLAIM TERM | AMSC'S PROPOSED CONSTRUCTION | S&C'S PROPOSED CONSTRUCTION |
|---|---|---|
| "substantially simultaneously" ('619 patent, claim 1; '521 patent, claims 8, 15, 22, 29, and 44)<br><br>"in a period substantially coincident with" ('619 patent, claim 10)[5] | "sufficiently close in time to at least partially cancel out a step-like change in line voltage" | "at the same logical step" / "during the same logical step as" |
| "activates the reactive power compensation device" ('619 patent, claim 1) | "causes the reactive power compensation device to begin to provide reactive power compensation of a second opposite polarity" | "turns on and connects the reactive power compensation device so that it delivers [provides] reactive power compensation of a second opposite polarity" |
| "in response to the need to connect" ('619 patent, claim 1) | No construction required / ordinary meaning | "in response to the same condition, i.e. the measured drop below (deviation from) the predetermined threshold value, that causes … to connect" |
| "predetermined first duration" ('619 patent, claims 10 and 21) | No construction required / ordinary meaning<br><br>or<br><br>"a period of time that is determined in advance" | "a fixed period of time set prior to detecting the change in the nominal value" |

(Joint Claim Const. St. at 2-5).

---

[5] The parties have agreed that the term "in a period substantially coincident with" will have the same meaning as is given to "substantially simultaneously."

1.      **"Substantially Simultaneously"**

Although the term "substantially simultaneously" appears in a number of claims of the

'619 and '521 patents, its use in claim 1 is typical:

> [A] controller, which, in response to the need to connect the shunt reactive power source
> to the utility power network, activates the reactive power compensation device and,
> **substantially simultaneously**, causes the shunt reactive power source to be connected to
> the utility power network.

U.S. Patent No. 6,900,619 at col. 7 ll. 35-40 (filed Nov. 24, 1999) (emphasis added).

The parties agree that the term "simultaneous" means "at the same time" and that

"substantially" modifies the term so that it encompasses more than theoretically exact

simultaneity (that is, the modifier defines the level of precision required to meet the claim). *(See*

Def. Op. Br. at 7-8; Hr'g Tr. at 25 ll. 11-23). The parties' disagreement concerns exactly how

the term "substantially" should be interpreted to modify the scope of the phrase.

S&C contends that AMSC utilized the modifier "substantially" so that the claim would

encompass practical situations where purely theoretical simultaneity would be difficult or

impossible. (*See* Def. Op. Br. at 8). It contends that interpreting "substantially simultaneously"

to mean "at the same logical step" captures the practical scope that AMSC intended. *See id.* It

relies on the specification (particularly, the drawings in the patent) and the prosecution history to

support that argument.

AMSC contends that S&C's interpretation of "substantially" contradicts the ordinary

meaning of the word and is not supported by either the patent specification or prosecution

history. (*See* Hr'g Tr. at 25 ll. 5-10). It further contends that in order to understand a qualitative

modifier (here, "substantially"), it is appropriate to interpret the term "in a functional manner, so

that its scope is consistent with the purposes of the invention." (Pl. Op. Br. at 21 (citing *Medrad,*

12

*Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005)).  Looking to the functional

purpose of the claim limitation (that is, softening the step-like voltage change), AMSC contends

that the term "substantially simultaneously" should be interpreted to mean "sufficiently close in

time to at least partially cancel out a step-like change in line voltage."  (*See* Pl. Op. Br. at 21).

The Court first looks to the ordinary meaning of the term and how it is used in the claims;

if this provides a "firm basis for construing the term," then the inquiry is over.  *Phillips*, 415 F.3d

at 1313.  Here, the language of the claims provides little guidance as to how close in time the

activation and connection must be to fall within the claims, and indeed lends little support to

either party's proposed construction.  The claims in the '619 and '521 patents, even those not

including the disputed term, make no mention of a "logical step."  The claims also provide no

functional limitation as to the reason for having the actions occur "substantially simultaneously."

Nor do the claims provide any other guidance as to what the bounds of "substantial" spontaneity

might be.

The Court looks next to the specification.  The specification sets forth the functional

purpose of "substantial" simultaneity, which is to use a compensation device to offset "the

magnitude of a potentially large step-like change in reactive power."  '619 patent at col. 2 ll. 18-

23.  This comports with AMSC's proposed construction.  On the other hand, the specification of

neither patent refers to "logical steps."[6]  Therefore, the issue is whether AMSC's proposed

definition reflects an appropriate consideration of the function of the invention or whether it

---

[6] S&C relies on the use of the term "controller" in the claims and the prior art concerning "controller logic" as the basis for its use of the term "logical step" in its interpretation.  S&C also relies on Figure 3 of the '619 and '521 patents, which is a flowchart, for its phrasing, apparently reading the arrows on the chart to represent signals sent by the controller.  This argument stretches the bounds of the intrinsic record, and, even if permissible, is much less rooted in the text of the patent than AMSC's basis for its interpretation.

constitutes an impermissible addition of a new functional limitation to the claim. *Compare Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) (interpreting the term "substantially uniform magnetic field" using functional description from the preamble as "a field that is sufficiently uniform to obtain useful MRI images") *with Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1366 (Fed. Cir. 2001) (overturning a district court's functional definition of "substantially uniform," holding that "the fact that the claimed composition was designed to solve certain problems of the prior art and the fact that the patentee noted the functional import of having a homogeneous cast does not mean that we must attribute a function to the nonfunctional phrase 'substantially uniform.'"). This Court reads the *Medrad* decision to hold that it is permissible, but not always necessary, to consider the function of the invention (among other factors) when interpreting claims. In *Medrad,* the court had very little guidance in the patent for the definition of the term "substantially uniform;" it therefore looked to the preamble and to the "conventional understanding of the term in the MRI industry" and found that "substantial" in that instance meant values close enough to uniformity that were "sufficient" to produce useful images. *Medrad*, 401 F.3d 1313 at 1320. In *Ecolab,* by contrast, there was structural language in the claim, specification, and prosecution history that made the addition of a functional limitation unnecessary to understand the scope of what was covered by the term "substantially uniform." *Ecolab*, 264 F.3d 1358, 1369.

This case is more analogous to *Medrad*. There is very little guidance in the patent as to the meaning of the term "substantially simultaneously." Because the term is a non-numerical temporal description, there is no helpful limiting structural description, as there was in *Ecolab*. Therefore, the Court has only the function of the invention to provide context and constrain the

14

scope of the claim to "what the inventors actually invented" in terms of the timing of activation and connection. *Philips*, 415 F.3d at 1316.

As noted above, and as set forth in the specification, the purpose of having the two things occur simultaneously is so that the one (the activated reactive power compensation device) can cancel out or negate the other (the step-like change in reactive power). Whether those events are at the same "logical" step does not define or limit the function of the device; what is significant is that the two things cancel each other out. Accordingly, and following the approach of the Federal Circuit in *Medrad*, the term "substantially simultaneously" should be construed to mean "sufficiently close in time to at least partially cancel out a step-like change in line voltage."

The Court further notes that the prosecution history is not informative as to this term. It is not necessary to decide whether AMSC disavowed performing the actions "in succession" to interpret the meaning of "substantially simultaneously," because the former term encompasses a wide range of timings that do not fall within the latter. In any event, the Court finds that AMSC did not "unequivocally disavow" performing the actions "in succession." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003). The bar for such disclaimer is high, and AMSC's statements do not meet it. "[B]ecause the prosecution history represents an ongoing negotiation between the PTO and the applicant, . . . it often lacks the clarity of the specification . . ." *Phillips*, 415 F.3d at 1317. Therefore, "in order to disavow claim scope during prosecution a patent applicant must clearly and unambiguously express surrender of subject matter." *Voda*, 536 F.3d at 1321 (internal quotations omitted); *Sorensen v. Int'l Trade Comm'n*, 427 F.3d 1375, 1378-79 (Fed. Cir. 2005); *see also Omega Eng'g*, 334 F.3d at 1324 ("We have . . . declined to apply the doctrine of prosecution disclaimer where the alleged disavowal of claim scope is

ambiguous."); *DeMarini Sports v. Worth, Inc.*, 239 F.3d 1314, 1326-27 (Fed. Cir. 2001) (patentee's silence was insufficient to construe claim term).

S&C relies on incomplete quotations that misconstrue the arguments AMSC made in the patent prosecution to distinguish the '619 patent from the prior art. Specifically, AMSC distinguished its invention from the prior art—not because the cited article (a 1990 article by Banerjee, *et al.*, entitled "Application of Magnetic Energy Storage Unit as Continuous VAR Controller") disclosed performing the actions "in succession" (a phrase that appears only in S&C's brief)—but because it did *not* disclose performing them "substantially simultaneously." S&C ignores the fact that it would be logically consistent for both Banerjee's and AMSC's inventions to involve actions taken "in succession," provided the actions disclosed by AMSC occurred close enough in time to be "substantially simultaneous" while Banerjee's did not. For these reasons, the Court finds that AMSC did not clearly and unambiguously disavow switching the capacitor bank on and providing reactive power compensation "in succession."

In summary, the Court will construe the term "substantially simultaneously" to mean "sufficiently close in time to at least partially cancel out a step-like change in line voltage."

### 2. "Activates the Reactive Power Compensation Device"

This term appears in Claim 1 of the '619 patent:

[A] controller, which, in response to the need to connect the shunt reactive power source to the utility power network, **activates the reactive power compensation device** and, substantially simultaneously, causes the shunt reactive power source to be connected to the utility power network.

'619 Patent at col. 7 ll. 35-40 (emphasis added).

The parties agree that the term "reactive power compensation device" means the device providing reactive power of a second, opposite polarity. The parties disagree as to the meaning

16

of the term "activates" with respect to such a device.

S&C contends that "activates" means "turns on and connects," because "activating" the device is distinct from the device actually providing reactive power. (*See* Def. Op. Br. at 12). S&C's argument is based on the premise that the use of the word "and" between two verbs signifies distinct actions. S&C refers to the '619 patent, which describes a signal ". . . to activate inverter 44 *and* begin ramping inverter reactive output from zero to full overload." (*See* Def. Op. Br. at 12) (citing '619 Patent at col. 5 ll. 61-64 (emphasis added)).

AMSC contends that "activates" means "causes [the device] to begin provide reactive power." AMSC contends that this more closely comports with the ordinary meaning of the term. For support, AMSC cites a dictionary definition of "activate" as simply "to make active." AMSC contends that a reactive power compensation device is made active when it begins providing reactive power.

Again, the Court first looks to the ordinary meaning of the term and how it is used in the claim. *Phillips*, 415 F.3d at 1313. Here, the plain language of the claim that employs the term "activates the reactive power compensation device" provides some guidance as to whether the term refers to turning on and connecting or whether it refers to simply beginning to provide power. The very next phrase in Claim 1 of '619 patent discloses that a controller, "substantially simultaneously [with activation of the reactive power compensation device], causes the shunt reactive power source *to be connected* to the utility power network." '619 Patent at col. 7 ll. 35-40 (emphasis added). The claim thus indicates that while the reactive power compensation device is "activated" the shunt reactive power source is "connected." This conscious choice of different verbs in the same claim to describe simultaneous actions strongly suggests that

17

"activating" is not synonymous with "connecting."

Similarly, the ordinary meaning of "activate" is "to make active." That definition comports with AMSC's proposed construction because, in the context of reactive power compensation, a device is active when reactive power is flowing through it into the system. Therefore, to "activate" such a device would mean to make it begin to provide reactive power to the system.

The specification also supports AMSC's interpretation of the term. S&C notes that the specification includes the phrase ". . . to activate inverter 44 *and* begin ramping inverter reactive output from zero to full overload." '619 Patent at col. 5 ll. 61-64 (emphasis added). It argues that the word "and" necessarily signifies separate and distinct actions. That argument, however, is unduly simplistic. In ordinary English, the use of the conjunction "and" is often used to signify a direct consequence, not a separate action. This is illustrated by the following example, where the two parts of a phrase containing "and" describe the same act: "I am going to turn on the air-conditioner and begin cooling off the room." Another portion of the specification of the '619 patent provides support for this reading because it separates the same phrases not with "and" but with "to." The system is "activated *to* ramp upward to provide the maximum amount of capacitive resistance. . ." '619 Patent at col. 6 ll. 2-3 (emphasis added).

Because the ordinary meaning and the specification together provide a firm basis for construing the term "activates," the Court will interpret the term "activates the reactive power compensation device" to mean "causes the reactive power compensation device to begin to provide reactive power compensation of a second opposite polarity."

### 3.   <u>"In Response to the Need to Connect"</u>

This term also appears in Claim 1 of the '619 patent:

> [A] controller, which, **in response to the need to connect** the shunt reactive power source to the utility power network, activates the reactive power compensation device and, substantially simultaneously, causes the shunt reactive power source to be connected to the utility power network.

'619 Patent at col. 7 ll. 35-40 (emphasis added).

The parties agree that the term "in response to the need to connect" should generally be interpreted by its plain meaning.  They further agree that what happens "in response to the need to connect" includes both (1) connecting the shunt reactive power source and (2) substantially simultaneously activating the reactive power compensation device.  However, the parties disagree as to whether the term "the need" requires further interpretation.

S&C contends that "*the* need" refers to a " voltage-drop condition" that triggers both actions.  (Def. Op. Br. at 18-19).  It concedes that the threshold value of the voltage-related condition is variable, but contends that "the need" always refers to some percentage threshold of voltage flowing through the line.

AMSC contends that the term needs no further construction, and that S&C's reference in its interpretation to the specific "condition" of a voltage drop impermissibly reads a limitation into the claim.

It is well-established that "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).  S&C relies on the specifications of the '619 and '521 patents as the basis for its construction of "the need."  (Def.

19

Op. Br. at 19).  The '619 specification does indeed indicate that when voltage flowing through the

line drops below 98%, the shunt reactive power source is needed.  However, the claim does not

indicate (nor does the specification, for that matter) that this is the only reason the shunt reactive

power source would need to be connected.  To the extent that S&C is attempting to limit the

claim to include *only* those situations where voltage drops below a threshold level and no other

"need," the Court finds that S&C's construction would require reading a new limitation into the

claim. Accordingly, the Court finds that further defining the term "the need" as per S&C's

proposed interpretation would impermissibly read a new limitation into the claim.  The Court will

therefore interpret the term "in response to the need to connect" to have its plain meaning and

indicate that it refers to the time when both connecting the shunt reactive power source, and,

substantially simultaneously, activating the reactive power compensation device occur.

### 4.    "Predetermined First Duration"

This term appears in claims 10 and 21 of the '619 patent.  Claim 10 provides an example

of how the term is used:

> [C]onnecting, in response to detecting the change in the nominal voltage, the shunt
> reactive power source to the utility power network to provide reactive power
> compensation of a first polarity, and providing, for a **predetermined first duration**,
> reactive power compensation of a second opposite polarity to the utility power network . .
> .

'619 Patent at col. 8 ll. 14-20 (emphasis added)**.**

The parties agree that the term "first duration" refers to a "period of time."  The

disagreement with the respect to the term "predetermined first duration" concerns whether the

term "predetermined" requires interpretation that goes beyond its plain meaning.

S&C contends that "predetermined" means "set" or "fixed" "*prior to detecting the change*

*in the nominal value.*"  (Def. Op. Br. at 20-21) (emphasis added).  Relying on the '619

specifications where "predetermined" is used in other contexts, S&C insists that the Court should

not interpret the term so that it potentially includes a duration that is calculated dynamically.

S&C further relies on the prosecution history to suggest that the patent examiner had a similar

understanding of the term "predetermined first duration," and that AMSC did not challenge or

rebut such interpretation when given the opportunity.

AMSC contends that the term needs no further construction, because a layperson could

understand it, but, should the Court construe the term, it should be given its plain meaning, which

is "a period of time that is determined in advance."  AMSC contends that S&C's position

impermissibly reads a limitation into the claim.

Both AMSC and S&C's constructions comport with the ordinary meaning of the term

"predetermined," which is "determined beforehand."  The issue is whether this ordinary meaning,

taken in the context of the claim at issue, provides a "firm basis for construing the term" or

whether, as S&C contends, a more detailed, confining definition is required.  *Phillips*, 415 F.3d at

1313.  The Court finds that the ordinary meaning should be supplemented only to define what the

duration must be determined "before" (in other words, "in advance of").

As noted, S&C's proposed construction would limit the term to the time before any

change in nominal value is detected.  But there is no "clear indication in the intrinsic record that

the patentee intended the claims to be so limited."  *Liebel-Flarsheim*, 358 F.3d at 913.  S&C

relies on the use of the term "predetermined" in the '619 specification, where it refers to a

threshold voltage value.  *See* '619 Patent at col. 5 ll. 59-62.  S&C argues that because the

specification defines this predetermined threshold as 98% without pinning the threshold to the

monitored voltage values, "predetermined" must mean set in advance of any monitoring.  S&C contends that "predetermined" should be given a similar meaning with respect to the "first duration" of opposite-polarity power—that is, the duration is set before detecting any change in nominal value.  Although it may be true that the specification itself "predetermines" or "sets" the threshold voltage value well in advance of monitoring, the specification does not explicitly do the same for the "first duration" of opposite-polarity reactive power compensation.  Therefore, the Court will not explicitly limit the time period during which the "first duration" can be set to that time "prior to detecting the change in the nominal value." (Def. Op. Br. at 21).

S&C's contention that AMSC's construction is ambiguous, in that it does not identify what it is that the "first duration" must be determined "in advance of," is compelling.  However, S&C's further contention, that the term must be set in advance of "detecting any change in nominal value," lacks support in the intrinsic record.  Instead, the Court finds support in the claim itself for constraining the term to be set in advance of  "providing reactive power of a second opposite polarity."  The ordinary meaning of the term "predetermined" and the natural language of the claim suggest that the action before which the duration must be determined is the provision of reactive power of a second opposite polarity.  If an action is to be done for a "predetermined first duration," it follows that the duration must be determined before commencing that action.  In this case what is to be done for a "predetermined first duration" is "providing . . . reactive power compensation of a second opposite polarity to the utility power network."  '619 Patent at col. 8 ll. 19-20.  The Court will therefore interpret the term "predetermined first duration" to mean "a period of time that is determined in advance of providing reactive power of a second opposite polarity."

### 5.     Construing the Terms

Accordingly, the Court will adopt the following constructions of these terms:

| CLAIM TERM | CONSTRUCTION |
|---|---|
| "substantially simultaneously" ('619 patent, claim 1; '521 patent, claims 8, 15, 22, 29, and 44)<br><br>"in a period substantially coincident with" ('619 patent, claim 10) | "sufficiently close in time to at least partially cancel out a step-like change in line voltage." |
| "activates the reactive power compensation device" ('619 patent, claim 1) | "causes the reactive power compensation device to begin to provide reactive power compensation of a second opposite polarity" |
| "in response to the need to connect" ('619 patent, claim 1) | No construction required / ordinary meaning |
| "predetermined first duration" ('619 patent, claims 10 and 21) | "a period of time that is determined in advance of providing reactive power of a second opposite polarity" |

B.      **The Claim Term of the '170 Patent**

The proposed constructions of the disputed term in the '170 patent are as follows:

| CLAIM TERM | AMSC'S PROPOSED CONSTRUCTION | S&C'S PROPOSED CONSTRUCTION |
|---|---|---|
| "transient thermal capacity characteristic" ('170 patent, claims 17, 20, 23, 24, 45, 48, 51, 53, and 73) | "a characteristic of the power compensation device reflecting its ability to temporarily withstand the accumulation of heat (e.g., an $i^2t$ rating)" | "the measured and accumulated (i.e., the sum of) thermal energy (i.e., heat) in the power compensation device" |

(Joint Claim Const. St. at 4).

1.      **"Transient Thermal Capacity Characteristic"**

Although the term "transient thermal capacity characteristic" appears in a number of claims of the '170 patent, its use in claim 73 is indicative:

> [A] controller. . . calculates at least one rate of continuous decrease of power form one overload level to a second level lower than the first overload level on the basis of a **transient thermal capacity characteristic** of the power compensation device. . .

'170 Patent at col. 14 ll. 11-19 (emphasis added).

The parties agree that this term refers to the accumulation of heat within the power compensation device. The parties disagreement concerns whether the term "thermal" refers only to "heat" and whether the term "capacity" refers to a fixed value or a measured value.

S&C contends that the term "thermal" refers only to "heat." It contends that AMSC's proposed construction allows "thermal" to include "something other than heat." (Def. Op. Br. at 15). It further contends that "capacity" is the sum of "measured values" rather than a fixed value or threshold. (*Id.*). It proposes that the entire term "transient thermal capacity characteristic" therefore means "the measured and accumulated (i.e., the sum of the) thermal energy (i.e., heat) in

the power compensation device." (*Id.* at 14).

AMSC contends that "thermal" is an adjective meaning "pertaining to heat or temperature," which modifies the term "capacity." (Pl. Op. Br. at 24). It does not contend that its construction of "thermal" would include "something other than heat." Instead, it simply contends that the patent expressly identifies an $I^2t$ rating, which includes current ("I") as part of its calculation, as an example of a "transient thermal capacity characteristic." (*See* Pl. Rep. Br. at 14; '170 Patent at col. 11 ll. 3-5). AMSC also contends that "capacity" has its ordinary meaning, which is "the ability to receive or contain." (Pl. Op. Br. at 24). AMSC's proposed construction of the term "transient thermal capacity characteristic" is "a characteristic of the power compensation device reflecting its ability to temporarily withstand the accumulation of heat (e.g., an $I^2t$ rating)." (*Id.*).

Again, the Court first looks to the ordinary meaning of the term and how it is used in the claims. *Phillips*, 415 F.3d at 1313. Here, the ordinary meaning of the term "thermal" is sufficient to provide a firm basis for construing the term in the context of the claim. "Thermal" is an adjective that ordinarily means "of, relating to, or caused by heat." This definition comports with both parties' construction of the term. To the extent that S&C attempts to limit this construction further to exclude $I^2t$ as not relating to heat, the Court finds that such a construction does not comport with the ordinary meaning or with the intrinsic record.

The ordinary meaning of the term "capacity" is "the maximum amount or number that can be contained or accommodated." The capacity of a ten-gallon water tank, for example, is ten gallons. This comports with AMSC's construction of the term as reflective of "the ability to temporarily withstand the accumulation of heat." It does not comport with S&C's construction of

the term as the sum of measured values.  The Court finds the ordinary meaning instructive, but

not entirely dispositive.

It is undisputed that dependent claims in the '170 patent refer to an $I^2t$ rating as an

example of a "transient thermal capacity characteristic."  '170 Patent at col. 11 ll. 3-5; col. 12 ll.

53-58.  It is also undisputed that an $I^2t$ rating is a term of art that refers to a device's ability to

withstand the accumulation of heat generated by a current over time where "I" stands for electric

current and "t" stands for the length of time the current flows.  (Pl. Rep. Br. at 14).  Because this

is not a measured quantity, but rather a calculated figure (presumably based on measured

quantities), S&C's proposed construction would not encompass this disclosed example.  It is

well-established that because claim terms are normally used consistently throughout the patent,

the meaning of a term in one claim is likely the meaning of that same term in another.  *Phillips*,

415 F.3d at 1314.  S&C's proposed construction would not allow the term "transient thermal

capacity characteristic" to be consistently interpreted throughout the patent because an $I^2t$ rating is

not "measured and accumulated."

S&C attempts to refute that argument by referring to the prosecution history of the '170

patent.  Its argument, however, is not compelling for two reasons.  First, and most importantly,

the First Circuit in *Phillips* laid out a clear hierarchy of the definitional sources that give a patent

its meaning, and the text of the patent claims is to be given substantially more weight than the

patent prosecution history.  Second, the cropped quotations S&C relies on from the prosecution

history do not unequivocally support its interpretation.[7]  Accordingly, the Court will interpret the

_____

[7] S&C relies heavily on the proposition that when the phrase "[T]hat is," follows a noun, it signifies the
beginning of the definition of an equivalent thing.  The sentences referred to by S&C read, "The controller
determines a time period of the continuously decreasing power on the basis of a *transient thermal capacity
characteristic* of the power compensation device.  *That is*, *based on the accumulated thermal energy in the power*

26

term "transient thermal capacity characteristic" to mean "a characteristic of the power

compensation device reflecting its ability to temporarily withstand the accumulation of heat (e.g.,

an $I^2t$ rating)"

| CLAIM TERM | CONSTRUCTION |
|---|---|
| "transient thermal capacity characteristic" ('170 patent, claims 17, 20, 23, 24, 45, 48, 51, 53, and 73) | "a characteristic of the power compensation device reflecting its ability to temporarily withstand the accumulation of heat (e.g., an $I^2t$ rating)" |

## IV.   Conclusion

For the foregoing reasons, the disputed claim terms are construed as follows:

1.      the terms "substantially simultaneously" and "in a period substantially coincident

with" mean "sufficiently close in time to at least partially cancel out a step-like

change in line voltage";

2.      the term "activates the reactive power compensation device" means "causes the

reactive power compensation device to begin to provide reactive power

compensation of a second opposite polarity";

3.      the term "in response to the need to connect" has its ordinary meaning and need

not be given special construction by the Court;

---

*compensation device*, [the controller determines the duration]. . ." (Def. Op. Br. at 16) (emphasis).  As this instance exemplifies, although "[T]hat is" may signify a definition by restating the term in different words, it may refer to the entire preceding sentence.  In this case, the controller is presumably monitoring the accumulated heat and determining how much more the device can take on the basis of the transient thermal capacity characteristic.  The controller must know both the capacity of the device and the amount accumulated by the device to determine when to stop it without overheating.  This reading also comports with an ordinary meaning of "based on," which generally indicates a foundational fact or measurement that helps to establish the larger product.

4.      the term "predetermined first duration" means "a period of time that is determined in advance of providing reactive power of a second opposite polarity";

5.      the term "transient thermal capacity characteristic" means "a characteristic of the power compensation device reflecting its ability to temporarily withstand the accumulation of heat (e.g., an $I^2t$ rating)."

**So Ordered.**


_/s/ F. Dennis Saylor_____
F. Dennis Saylor IV
United States District Judge

Dated:   November 26, 2012